## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ABBOTT LABORATORIES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 12-457-RGA-CJB |
| | ) |
| ROXANE LABORATORIES, INC., | ) |
| | ) |
| Defendant. | ) |

### REPORT AND RECOMMENDATION

Presently pending before the Court in this Hatch-Waxman dispute involving five patents are four fully-briefed motions: (1) a motion by Defendant Roxane Laboratories, Inc. ("Defendant" or "Roxane") to transfer this action to the U.S. District Court for the Southern District of Ohio (the "Motion to Transfer") (D.I. 13); (2) Plaintiff Abbott Laboratories' ("Plaintiff" or "Abbott") motion to dismiss all claims and counterclaims related to two of the asserted patents without prejudice ("Abbott's Motion to Dismiss") (D.I. 24); (3) Roxane's motion to dismiss the Complaint for lack of subject matter jurisdiction due to Abbott's August 2012 assignment of the patents-in-suit to AbbVie Inc. ("AbbVie") ("Roxane's Motion to Dismiss") (D.I. 32); and (4) Abbott's related motion to substitute AbbVie as Plaintiff in this action ("Motion to Substitute") (D.I. 34).

For the reasons that follow, I recommend that the Motion to Substitute be GRANTED, that Roxane's Motion to Dismiss be DENIED, that Roxane's Motion to Transfer be GRANTED and that Abbott's Motion to Dismiss be DENIED as moot.[1]

---

[1] Of the four pending motions, the two Motions to Dismiss are dispositive motions, which are resolved by the Court pursuant to 28 U.S.C. § 636(b)(1)(B) and D. Del. LR 72.1(a)(3). The Motion to Substitute is a non-dispositive motion, which may be resolved by the Court pursuant to 28 U.S.C. § 636(b)(1)(A) and D. Del. LR 72.1(a)(2). *See, e.g., Mars, Inc. v. JCM*

## I.    BACKGROUND

### A.    The Parties

Neither of the original parties to this action are Delaware corporations. Abbott, a corporation engaged in the business of research, development, manufacture and sale of pharmaceutical products throughout the world, is an Illinois corporation. (D.I. 8 at ¶ 1). Its corporate headquarters are located in Abbott Park, Illinois. (*Id.*) Roxane, a company that develops, markets and sells pharmaceutical ingredients, formulations and products, is a Nevada corporation with its principal place of business in Columbus, Ohio. (*Id.* at ¶¶ 2, 6)

In October 2011, Abbott announced that it was undergoing a major reorganization of its worldwide business operations, whereby it was separating into two publicly traded companies: one focusing on research-based pharmaceuticals and the other on diversified medical products. (D.I. 34 at 2, ex. A) The research-based pharmaceutical company, AbbVie, is a Delaware corporation that is a wholly-owned subsidiary of Abbott. (*Id.*) (The diversified medical products company retains the Abbott name.) (*Id.*) The transition of Abbott's research-based pharmaceutical business to AbbVie by the end of 2012 involved AbbVie's acquisition of all of Abbott's patents and patent applications pertaining to Abbott's proprietary pharmaceuticals and biologics. (D.I. 38 at 3)

---

*Am. Corp.*, Civil No. 05-3165 (RBK), 2007 WL 776786 (D.N.J. Mar. 9, 2007); *Finova Capital Corp. v. Lawrence*, No. 399CV2552–M, 2000 WL 1808276, at *1 n.1 (N.D. Tex. Dec. 8, 2000) (citing cases). There is a split of authority in the courts as to whether the Motion to Transfer should be treated as a dispositive or non-dispositive motion, though the most recent precedent from our Court suggests that such a motion is most properly treated as not dispositive. *See, e.g., Pragmatus AV, LLC v. Yahoo! Inc.*, C.A. No. 11-902-LPS-CJB, 2013 WL 174499, at *1 (D. Del. Jan. 16, 2013); *In re Heckmann Corp. Sec. Litig.*, C.A. No. 10-378-LPS-MPT, 2011 WL 1219230, at *1 (D. Del. Mar. 31, 2011). Because at least some of the pending motions are dispositive motions, the Court has titled this document as a "Report and Recommendation."

**B.    Procedural Background**

This case arises out of Roxane's submission of Abbreviated New Drug Application ("ANDA") No. 202-573 to the United States Food and Drug Administration ("the FDA"), which seeks approval to market a generic version of Norvir®, a brand-name drug used to treat human immunodeficiency virus, more commonly known as HIV. (D.I. 8 at ¶¶ 12–14, 23) Abbott is the owner of approved New Drug Application ("NDA") No. 22-417, which covers ritonavir, the active ingredient in Norvir®. (*Id.* at ¶ 12) Abbott listed eight patents in the *Approved Drug Products With Therapeutic Equivalence Evaluations* (the "Orange Book") for NDA No. 22-417: U.S. Patent Nos. 5,541,206 ("the '206 patent"); 5,635,523 ("the '523 patent"); 5,648,497 ("the '497 patent"); 5,674,882 ("the '882 patent"); 6,037,157 ("the '157 patent"); 6,703,403 ("the '403 patent"); 7,148,359 ("the '359 patent"); and 7,364,752 ("the '752 patent"). (D.I. 16, ex. E) All of these patents were assigned to Abbott as of the filing of the Complaint in this case. The first of these patents to expire will be the '206 and '882 patents in 2013, while the two most recently issued patents (the '359 and '752 patents) will not expire until 2019 and 2020, respectively. (*Id.*)

On March 24, 2011, Roxane notified Abbott that it had filed ANDA No. 202-573, seeking approval to market Roxane's generic version of ritonavir prior to the expiration of the '359 patent and the '752 patent.[2] (D.I. 8 at ¶ 16) None of the other patents listed in the Orange Book as covering NDA No. 22-417 were identified in Roxane's ANDA. Roughly one year later, on April 6, 2012, Roxane notified Abbott that it had amended its paragraph IV certification, and now sought approval to market its generic version of ritonavir prior to the expiration of the '497

---

[2]      Roxane's ANDA included a certification ("paragraph IV certification") that, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), the '359 and '752 patents are invalid or will not be infringed by the manufacture, use, or sale of the generic drug for which the ANDA is submitted.

patent, the '157 patent, and the '403 patent.[3]  (*Id.* at ¶ 17)

On April 10, 2012, four days after Abbott received Roxane's notice of an amended ANDA, Roxane filed suit in the Southern District of Ohio seeking a declaratory judgment that the '359 and '752 patents (collectively, "the Ohio patents-in-suit") are invalid and/or will not be infringed by Roxane's generic ritonavir product. *Roxane Labs., Inc. v. Abbott Laboratories*, 2:12-cv-312-MHW-NMK (S.D. Ohio) (hereinafter "the Ohio Action"); (D.I. 14 at 2, 5). The Ohio Action was assigned to United States District Judge Michael H. Watson. Later that same day, Abbott filed the Complaint in the present action (hereinafter "the Delaware Action"), asserting infringement of the two Ohio patents-in-suit and the '497 patent. (D.I. 1) On April 11, 2012, Abbott filed an Amended Complaint in this Court, which also asserted infringement of the other two patents that were added in Roxane's amended ANDA (the '157 patent, and the '403 patent).[4] (D.I. 8) On April 12, 2012, Abbott filed a motion to dismiss the Ohio Action, or in the alternative, to transfer the Ohio Action to the District of Delaware. (D.I. 16, ex. H)

On May 1, 2012, Roxane filed the instant Motion to Transfer, seeking to transfer the Delaware Action to the Southern District of Ohio. (D.I. 13)[5] Abbott responded to Roxane's motion, and briefing on the motion was completed on May 29, 2012. (D.I. 16, 17) The Court held oral argument on Roxane's motion to transfer this action on July 12, 2012. (D.I. 28)

---

[3]      Roxane has not filed a paragraph IV certification for the '206 patent, the '523 patent, or the '882 patent.

[4]      The '352 patent, the '752 patent, the '497 patent, the '157 patent, and the '403 patent are collectively referred to as "the Delaware patents-in-suit."

[5]      On May 9, 2012, Judge Richard G. Andrews referred the instant case to the Court to hear and resolve all pretrial matters, up to and including the resolution of case-dispositive motions.

4

During the pendency of Roxane's motion in this Court, Judge Watson heard oral argument relating to Abbott's motion to transfer or dismiss the Ohio Action. (D.I. 20, ex. A at 1) Judge Watson denied Abbott's motion, (*id.* at 7), and entered a preliminary scheduling order that set deadlines for discovery and *Markman* proceedings, (D.I. 28 at 7). Judge Watson also later denied Roxane's motion to enjoin Abbott from proceeding with the Delaware Action. (D.I. 30)

On July 6, 2012, Abbott moved to dismiss without prejudice all claims and counterclaims in the Delaware Action directed to the '359 patent and the '759 patent. (D.I. 24) On July 11, 2012, Roxane filed a response to Abbott's motion, arguing that the motion was merely an attempt to manipulate venue by influencing the outcome of its Motion to Transfer. (D.I. 27) Briefing on Abbott's Motion to Dismiss in the Delaware Action was completed on July 23, 2012. (D.I. 29)

Just a few weeks later, the procedural posture of this case took another turn. On August 28, 2012, Abbott filed a letter with the Court, informing the Court of Abbott's decision to separate into two publicly traded companies. (D.I. 31 at 1) Abbott noted that in furtherance of this planned reorganization, on August 1, 2012, it had assigned the Delaware patents-in-suit to AbbVie (at the same time that Abbott assigned thousands of patents and patent applications from countries around the world to AbbVie). (*Id.*; D.I. 38 at 3-4 & ex. B). It noted that given this change in ownership, "AbbVie is unquestionably the proper plaintiff and Abbott will be working with Roxane on an appropriate stipulation to substitute AbbVie for Abbott as plaintiff in the case." (D.I. 31 at 1) Abbott also noted its belief that AbbVie's status as a Delaware corporation "adds to the weight given to Delaware" in the analysis of Roxane's Motion to Transfer. (*Id.* at 1-2)

Work on the stipulation proposed by Abbott never materialized, as just a day later, on

5

August 29, 2012, with its Motion to Transfer pending, Roxane filed its Motion to Dismiss. (D.I. 32) In a memorandum filed along with the motion, Roxane argued that because Abbott had assigned the patents-in-suit to AbbVie and no longer held legal title to those patents, its dispute with Roxane had become moot and there remained no justiciable case or controversy in this matter to support Article III jurisdiction. (D.I. 33 at 1) The very same day, August 28, 2012, Abbott filed its Motion to Substitute, arguing that in light of the assignment of the patents-in-suit to AbbVie, the Court should order AbbVie substituted for Abbott as the plaintiff in this case pursuant to Federal Rule of Civil Procedure 25(c). (D.I. 34 at 2)

The parties went on to complete briefing on these two motions by October 1, 2012—with Roxane arguing that dismissal, not substitution, was the proper result stemming from the AbbVie assignments, and Abbott arguing the opposite. (D.I. 37, 38, 41, 42) In light of Abbott's later request for oral argument on these two new motions, (D.I. 43), and in light of the motions' potential impact on the entire case and on the pending Motion to Transfer, the Court held oral argument on December 3, 2012. (D.I. 59)

The parties have also thereafter made numerous supplemental filings regarding the motions, all of which the Court has reviewed. They have also proceeded with discovery in the case during the pendency of the motions. (D.I. 51-58)

## II.    DISCUSSION

### A.    Roxane's Motion to Dismiss and the Motion to Substitute

Roxane's Motion to Dismiss and the Motion to Substitute both relate to the same underlying issue: how does Abbott's assignment of the patents-in-suit to AbbVie impact this litigation?

6

### 1.    Standards of Review

#### a.    Roxane's Motion to Dismiss

Pursuant to Rule 12(b)(1), the Court may dismiss a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Motions brought under Rule 12(b)(1) may present either a facial or a factual challenge to the Court's subject matter jurisdiction. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977); *Enhanced Sec. Research, LLC v. Juniper Networks, Inc.*, C.A. No. 09-871-JJF, 2010 WL 2898298, at *2 (D. Del. July 20, 2010). With respect to a factual challenge like the one at issue in Roxane's Motion to Dismiss, the Court may consider evidence outside the pleadings, including affidavits, depositions, and testimony, to resolve factual issues bearing on jurisdiction. *Enhanced Sec. Research*, 2010 WL 2898298, at *2 (citing *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997)). Moreover, in reviewing such a challenge, the presumption of truthfulness does not attach to the allegations of the complaint. *Id.* (citing *Mortensen*, 549 F.2d at 891). Once the Court's subject matter jurisdiction is challenged, the plaintiff must bear the burden of persuasion and establish that subject matter jurisdiction exists. *St. Clair Intellectual Prop. Consultants, Inc. v. Palm, Inc.*, Civil Action No. 06-404-JJF-LPS, 2009 WL 1220546, at *3 (D. Del. May 4, 2009) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406 (3d Cir. 1991)).

#### b.    Motion to Substitute

Federal Rule of Civil Procedure 25(c) provides that "[i]f an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party." Fed. R. Civ. P. 25(c). Rule 25(c) does not require a party or a court to take any action after an interest has been

7

transferred. *Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 71 (3d Cir. 1993). However, the Rule provides that if a party wishes to do so, it may move for substitution or joinder of a transferee in interest. Fed. R. Civ. P. 25(c). "Because joinder or substitution under Rule 25(c) does not ordinarily alter the substantive rights of parties, [the decision as to whether to grant a Rule 25(c) motion] is generally within the district court's discretion." *Luxliner*, 13 F.3d at 71–72.

The United States Court of Appeals for the Third Circuit has emphasized that a court's focus when assessing a Rule 25(c) motion must be on whether substitution or joinder would best "facilitate the conduct of the litigation." *Luxliner*, 13 F.3d at 72; *see also Fed. Deposit Ins. Corp. v. Tisch*, 89 F.R.D. 446, 448 (E.D.N.Y. 1981) (noting that because the decision to order substitution or joinder does not impact a party's substantive rights, the decision should "be made by considering how the conduct of the lawsuit will be most facilitated"). In examining a Rule 25(c) motion, the court must first analyze "the respective rights and liabilities among the parties and the transferee under the substantive law governing the case," and then must determine "whether it would best facilitate the conduct of the case to have the transferor remain in the case, substitute the transferee, or join the transferee and continue with both as parties." 6 James Wm. Moore, et al., *Moore's Federal Practice* § 25.34[3] (3d ed. 2011).

## 2. Analysis of Roxane's Motion to Dismiss and the Motion to Substitute

The United States Supreme Court has explained that, in order to satisfy Article III's standing requirements, a plaintiff must show that it has standing: that it has suffered "injury in fact," that the injury is fairly traceable to the challenged action of the defendant, and that it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 560-61 (1992).  The Supreme Court has also explained that "'through all stages of federal judicial proceedings,'" the plaintiff's cause of action must present a justiciable case or controversy, such that the plaintiff "'continue[s] to have a personal stake in the outcome of the lawsuit.'" *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477-78 (1990)).  "This means that, throughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" *Id.* (quoting *Lewis*, 494 U.S. at 477).  If, during the litigation, the plaintiff's claim no longer amounted to a case or controversy under Article III, its case would be moot.  *Id.*

With respect to standing in a patent infringement case, the Patent Act provides that "[a] patentee shall have remedy by civil action for infringement of his patent." *Sicom Sys., Ltd., v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005) (quoting 35 U.S.C. § 281).[6]  The Federal Circuit has explained that "[o]nly the entity or entities that own or control all substantial rights in a patent can enforce rights controlled by that patent, lest an accused infringer be subjected to multiple suits and duplicative liability." *IpVenture, Inc. v. Prostar Computer, Inc.*, 503 F.3d 1324, 1325 (Fed. Cir. 2007).  The term "'patentee'" comprises not only the patentee to whom the patent was issued, but also the successors in title to the patentee—that is, the party holding legal title to the patent. *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339 (Fed. Cir. 2007) (quoting 35

---

[6]        The law of the United States Court of Appeals for the Federal Circuit controls as to the legal question regarding whether a plaintiff has constitutional standing to assert certain patents against a defendant. *WiAV Solutions LLC v. Motorola, Inc.*, 631 F.3d 1257, 1263 (Fed. Cir. 2010); *see also Toshiba Corp. v. Wistron Corp.*, 270 F.R.D. 538, 540-41 (C.D. Cal. 2010) (noting that although procedural aspects of patent cases are typically controlled by the law of the circuit in which the case is filed, "Federal Circuit precedent controls standing under the Patent Act, as an issue unique to patent law").

9

U.S.C. § 100(d)). "A patent grant bestows the legal right to exclude others from making, using, selling or offering to sell the patented invention in the United States, or importing the invention." *Id.* Constitutional injury in fact occurs when a party performs at least one prohibited action with respect to the patented invention. *Id.*

If the patentee transfers all substantial rights in a patent, this amounts to an assignment; in such cases, the assignee may be deemed the effective "patentee" under the Patent Act for purposes of holding constitutional standing to sue another for patent infringement in its own name. *Sicom Sys.*, 427 F.3d at 976 (citing cases). An assignee may not sue for damages for infringing activity that occurred prior to the assignment unless the assignment agreement expressly grants the right to sue for such past infringement. *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1117 (Fed. Cir. 1996); *UD Tech. Corp. v. Phenomenex, Inc.*, C.A. No. 05-842-GMS, 2007 WL 28295, at *4 (D. Del. Jan. 4, 2007).

The Federal Circuit has made clear that in a patent infringement case, if the plaintiff who filed the original complaint lacked Article III standing, the suit must be dismissed. *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1203 (Fed. Cir. 2005). In such circumstances, the jurisdictional defect cannot be cured by the later addition of a party with standing, nor by the subsequent purchase by the plaintiff of an interest in the patent-in-suit. *Id.* (citing *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003); *Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 780 (Fed. Cir. 1996)).

In this case, however, it is undisputed that when the original Complaint was filed, Abbott was the owner of the patents-in-suit and that it had standing to sue. (D.I. 33 at 1-3; D.I. 38 at 5, 7-8; D.I. 41 at 1-3); *see also Schreiber Foods*, 402 F.3d at 1202 n.3 ("The initial standing of the

10

original plaintiff is assessed at the time of the original complaint, even if the complaint is later

amended.") It is also undisputed that on August 1, 2012, Abbott assigned legal title to the

patents-in-suit (including the right to sue for past, present and future infringement) to AbbVie.

(D.I. 33 at 1-3; D.I. 38 at 5, 7-8; D.I. 41 at 1) Both parties thus agree that as of the assignment,

Abbott lost a legally cognizable interest in the case, such that the case against Abbott became

moot.[7] (*Id.*); *see also Schreiber Foods*, 402 F.3d at 1203 (explaining that when a plaintiff with

standing transferred its rights in the patents-in-suit during the litigation, it "lost standing to sue

for infringement and the case became moot"). What the parties do dispute, however, is

whether—in light of Roxane's subsequent filing of its Motion to Dismiss—the Court is therefore

required to dismiss the case for lack of subject matter jurisdiction.

Roxane argues that dismissal is required, asserting that if "the plaintiff relinquishes its

rights to the patent during the pendency of the litigation, the dispute becomes moot and . . . there

remains no justiciable dispute between Abbott and Roxane [such that the] Amended Complaint

---

[7]        The doctrines of standing and mootness are distinct (though related) and not
always easy to differentiate. In the past, the Supreme Court has described mootness as "the
doctrine of standing set in a time frame: The requisite personal interest that must exist at the
commencement of the litigation (standing) must continue throughout its existence (mootness)."
*Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (internal quotation marks
and citations omitted). The Supreme Court has gone on to note that describing mootness as "the
doctrine of standing set in a time frame" is "not comprehensive" due to certain differences in the
doctrines. *Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC), Inc.*, 528 U.S. 167, 190
(2000). Nevertheless, it is clear that if a party's claim is that a plaintiff who had a sufficient
personal stake in the litigation when the lawsuit was filed (and thus had standing to sue)
nevertheless lost that personal stake in the outcome due to certain post-filing events, the
challenge is properly characterized as one of mootness. *Davis v. Fed. Election Comm'n*, 554
U.S. 724, 732-34 (2008); *Qimonda AG v. LSI Corp.*, 857 F. Supp. 2d 570, 574-75 & n.7 (E.D.
Va. 2012). This is the substance of Roxane's assertion here, and thus the Court believes that
Roxane's challenge is most properly characterized as one of mootness. *Cf. Qimonda*, 857 F.
Supp. 2d at 574-75.

11

must be dismissed for lack of jurisdiction." (D.I. 33 at 1) Roxane asserts that the standing issue should be judged at the moment there is a challenge to subject matter jurisdiction. (D.I. 33 at 5 n.3; D.I. 41 at 2) Therefore, it argues that because "Abbott lacked standing at the time of [the filing of Roxane's Motion to Dismiss]," Abbott should not be permitted to substitute AbbVie as Plaintiff pursuant to Rule 25(c), as "Rule 25(c) is not available to cure the jurisdictional defect here, for a procedural rule cannot create federal subject matter jurisdiction where none exists." (D.I. 41 at 2) For its part, although Abbott acknowledges that it lost standing to sue at the time of its assignment of the patents-in-suit to AbbVie, Abbott asserts that "[u]nder established Federal Circuit precedent, a patent owner may assign its rights during the pendency of a patent infringement action, not withstanding a gap of time between the original assignment and the substitution of the parties." (D.I. 38 at 2) Abbott argues that pursuant to Rule 25(c), its motion to substitute AbbVie as plaintiff in this action "was timely and the correct mechanism for bringing AbbVie into the case in Abbott's stead." (*Id.*)

### a. *Schreiber Foods*, *Qimonda* and the Authority Cited Therein

Abbott supports its arguments in part by citing to a number of Federal Circuit cases, most prominent among them *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198 (Fed. Cir. 2005). Roxane, however, focuses heavily on the decision in *Qimonda AG v. LSI Corp.*, 857 F. Supp. 2d 570 (E.D. Va. 2012). Because those cases analyze many of the issues that have resonance in this area, the Court will address them together.

In *Schreiber Foods*, plaintiff Schreiber Foods, Inc. ("Schreiber Foods"), a producer of cheese products, filed suit in January 1997 against a number of defendants, including Kustner Industries ("Kustner"). *Schreiber Foods*, 402 F.3d at 1200. The suit initially alleged that

12

defendants had infringed one patent ("the first patent"), which was owned at the time by Schreiber Foods. *Id.* In March 1997, while the case was being litigated, Schreiber Foods assigned the first patent, including all claims and causes of action thereunder, to its subsidiary Schreiber Technologies, Inc. ("Schreiber Technologies"), in return for Schreiber Technologies' grant of a non-exclusive license to the first patent back to Schreiber Foods. *Id.* Schreiber Foods did not inform defendants or the district court of the assignment and thus Schreiber Technologies was not joined as a party to the lawsuit. *Id.* Next, in December 1997, a second patent ("the second patent") was issued to Schreiber Foods, and Schreiber Foods amended its complaint to allege that Kustner also infringed that patent. *Id.* In that amended complaint, Schreiber Foods falsely stated that it owned and had standing to sue for infringement of the first patent. *Id.* at 1200-01. The case proceeded to trial in August 1998, during which a Schreiber Foods employee falsely testified that Schreiber Foods owned the first patent. *Id.* at 1201. The jury returned a verdict that the two patents-in-suit were valid and infringed and assessed $26 million in damages; defendants thereafter moved for a judgment notwithstanding the verdict. *Id.*

In September 1998, while that motion was pending, Schreiber Foods' counsel learned of the assignment of the first patent. *Id.* Instead of notifying the district court of the assignment at that stage, Schreiber Foods instead, on the advice of counsel, simply reacquired the first patent via assignment from Schreiber Technologies. *Id.* This second assignment was also not disclosed to the district court or to opposing counsel. *Id.* After the district court granted the judgment notwithstanding the verdict, only to have the Federal Circuit reverse and order the verdict reinstated, the district court entered judgment in Schreiber Foods' favor in September 2002. *Id.* Only thereafter, in October 2002, did Kustner learn (from an unrelated lawsuit), about the earlier

13

assignment of the first patent to Schreiber Technologies. *Id.* Kustner then brought a motion to vacate judgment pursuant to Rule 60(b), which the district court granted, holding that Schreiber Foods' lack of ownership of the first patent during the litigation had deprived it of standing and rendered the suit moot, such that the court's judgment was void. *Id.* at 1201-02.

In reviewing the district court's decision, the Federal Circuit first noted that "[a]t the time this action commenced, Schreiber [Foods] was the owner of the [first patent] and had standing" but that "once the assignment to Schreiber Technologies was completed, there was no question that Schreiber [Foods] lost its 'personal stake in the outcome'" of the case. *Id.* at 1202. It explained that because that assignment included the right to sue for all causes of action, including past infringement, Schreiber Foods became a mere non-exclusive licensee, and did not have constitutional standing to sue for the patent's infringement. *Id.* at 1202-03 (citing *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001)). However, the *Schreiber Foods* Court went on to note that "the mootness in this case was only temporary" as "Schreiber [Foods] regained its stake in the litigation when it reacquired the [first patent] before the entry of judgment." *Id.* at 1203. It noted that the question before it was "whether a judgment is void when there is a temporary transfer of the patent in suit to a non-party, which temporarily deprives the court of jurisdiction, even though the plaintiff owned the patent at the commencement of the suit and at the time of judgment?" *Id.*

Ultimately, the *Schreiber Foods* Court held that the judgment was not void in such circumstances. In doing so, it examined Supreme Court precedent on standing, finding that the rule that a plaintiff must have initial standing and "continue to have a 'personal stake in the outcome' of the lawsuit" to be a "rule [that] is not absolute." *Id.* (quoting *Spencer*, 523 U.S. at 7

14

(additional citation omitted)).  The Federal Circuit went on to describe Supreme Court precedent

in the area in this way:

> In cases where the plaintiff lacked initial standing or the case suffered from
> some other jurisdictional defect at the time suit is commenced, the Supreme
> Court's cases are less than clear as to whether and how a jurisdictional
> defect can be remedied in the course of litigation.  For example, the
> [Supreme] Court has held that, where federal jurisdiction is invoked
> initially on grounds of diversity, and diversity did not exist at the time of
> suit, it cannot be remedied by a change in citizenship before judgment.
> *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567 [] (2004).  On the
> other hand, where federal jurisdiction is invoked under the removal statute,
> dismissing a non-diverse party after removal and before judgment cures the
> defect.  *Caterpillar* [*Inc. v. Lewis*, 519 U.S. 61, 73 (1996)].

*Id.*  The *Schreiber Foods* Court noted that the Federal Circuit's own precedent established that if

an original plaintiff in a patent infringement case lacked standing, the suit must be

dismissed—but it explained that in the instant case, Schreiber Foods had constitutional standing

at the time the suit was commenced, and that "after assigning the [first patent] Schreiber [Foods]

reacquired it before the entry of judgment."  *Id.*

The Federal Circuit went on to further analyze both the Supreme Court's standing

jurisprudence and its own (and other circuits' decisions in the area) by noting the following:

> In circumstances where dismissal for lack of initial standing is not required,
> the Supreme Court held in *Caterpillar* that jurisdictional defects can be
> cured before judgment.  *Caterpillar* involved a Kentucky plaintiff suing an
> Illinois defendant and a Kentucky defendant.  After the suit was removed to
> federal court with both defendants, the Kentucky defendant settled and was
> dismissed from the suit.  The Supreme Court held that although "the
> complete diversity requirement [for removal jurisdiction] was not satisfied
> at the time of removal," "the jurisdictional defect was cured" by the
> dismissal of the non-diverse party.  *Caterpillar*, 519 U.S. at 70, 73 [].  This
> holding was confirmed by the Court in *Grupo* [*Dataflux*], which stated:
> "The postsettlement dismissal of the diversity-destroying defendant [in
> *Caterpillar*] cured the jurisdictional defect . . . the less-than-complete
> diversity which had subsisted throughout the action had been converted to

complete diversity between the remaining parties to the final judgment."
124 S. Ct. at 1925.

This court has also held that the temporary loss of standing during patent
litigation can be cured before judgement. In *Insituform Technologies, Inc.
v. Cat Contracting, Inc.*, 385 F.3d 1360, 1371-72 (Fed. Cir. 2004), the
original plaintiff was the owner of the patent at the time of filing suit. After
the trial and verdict, but before judgment, the patent (together with the right
to sue for past infringement) was transferred to the plaintiff's subsidiary,
which was then not a party to the suit. The subsidiary waited for two years
before filing a motion to be joined as a party, which was then granted
before judgment. We upheld the district court's joinder decision. *Id*. at
1372. Other circuits have taken a similar approach. *See ELCA Enters. v.
Sisco Equip. Rental & Sales*, Inc., 53 F.3d 186, 190-91 (8th Cir. 1995)
(ordering the substitution of the transferee of the real property in suit, and
holding that such substitution cured any potential jurisdictional defect
arising from the transfer of the property during litigation); *Corbin v.
Blankenburg*, 39 F.3d 650, 654 (6th Cir. 1994) (en banc) (ERISA trustee
who resigned lost requisite stake in litigation and could not continue as
plaintiff, but suit could continue because new trustee was substituted as
plaintiff five days later).

*Id*. at 1203-04.

Having set out these precedential guideposts, the *Schreiber Foods* Court ultimately held

that because Schreiber Foods "reacquired its stake in the litigation by reacquiring the [first

patent] (and causes of action thereunder) before the entry of judgment [the] jurisdictional defect

that had existed was cured before the entry of judgment and thus the judgment was not void." *Id.*

at 1204. Lastly, in a footnote, the *Schreiber Foods* Court noted that "Schreiber [Foods]

alternatively argues that, even if it had lacked standing, it would be entitled to continue as the

sole plaintiff under Rule 25(c) of the Federal Rules of Civil Procedure." *Id*. at 1204 n.6. It stated

that "[a]lthough we have grave doubts as to whether Schreiber [Foods] is correct, in light of our

disposition it is unnecessary to address this argument." *Id*.

In *Qimonda*, a case in the United States District Court for the Eastern District of Virginia,

16

plaintiff Qimonda AG ("Qimonda") filed suit against defendant LSI Corporation ("LSI") in November 2008, alleging infringement of seven patents assigned to Qimonda. *Qimonda*, 857 F. Supp. 2d at 572. During the pendency of the lawsuit, Qimonda entered into insolvency proceedings in Germany; Dr. Michael Jaffe was appointed by a German court as Qimonda's insolvency administrator. *Id.* Later, in July 2009, the United States Bankruptcy Court for the Eastern District of Virginia entered an order declaring that Dr. Jaffe was the sole and exclusive representative of Qimonda in the United States and had the power to administer Qimonda's assets in the United States. *Id.* at 573. LSI then filed a motion to dismiss the case pursuant to Rule 12(b)(1). *Id.* It argued that although Qimonda had standing to sue at the inception of the lawsuit, when Dr. Jaffe was vested with complete ownership and control over Qimonda's assets (namely, its patents), Qimonda lost any legally cognizable interest in the case—thus, the case was moot and should be dismissed for lack of subject matter jurisdiction. *Id.* at 575. After examining the factual and legal relationship between Qimonda, Dr. Jaffe and the patents-in-suit, the *Qimonda* Court determined that Dr. Jaffe, not Qimonda, possessed all substantial rights to those patents. *Id.* at 579.

The *Qimonda* Court then considered Qimonda's proposal that it be permitted to substitute Dr. Jaffe for it as the plaintiff in the litigation, pursuant to Rule 25(c). *Id.* In doing so, it considered the Sixth Circuit's decision in *Corbin v. Blankenburg*, 39 F.3d 650 (6th Cir. 1994) (en banc), a case that the *Schreiber Foods* Court had itself relied on. *Id.* at 579-80. The *Qimonda* Court recognized that in *Corbin*, an *en banc* Sixth Circuit held that when the trustee of an ERISA defined benefit plan brought suit on behalf of the plan, but later resigned his trusteeship in favor of another trustee, "subject matter jurisdiction was not irretrievably lost the

17

moment [the suing trustee] resigned his trusteeship, and subject matter jurisdiction, once it validly exists among the original parties, remains intact after substitution [of the new trustee under Rule 25(c)]." *Id.* at 580 (internal quotation marks omitted). However, the *Qimonda* Court also examined the reasoning of the dissenting judges, who had argued that once the former trustee lost his standing upon the date of his resignation, he had no interest to transfer to the successor trustee, and therefore could not move to substitute the successor trustee under Rule 25(c) at that point. *Id.* Agreeing with the dissenters, the *Qimonda* Court held that at the point of LSI's jurisdictional challenge, Qimonda "no longer had standing to sue, and this case became moot" and that "Qimonda's invocation of Rule 25 . . . was simply too late, as [Dr.] Jaffe could only step into the shoes of Qimonda when it had already lost standing to sue." *Id.* at 580-81. It continued:

> The Court notes that although the Federal Circuit has held that a temporary loss of standing before judgment can be cured where the jurisdictional challenge occurs *after* the party holding all substantial rights has been joined, *see Instituform Techs., Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1371-72 (Fed. Cir. 2004), it has expressed "grave doubt" that the Rule 25(c) substitution vehicle may be invoked to continue an action at the time the plaintiff lost standing to sue. *See Schreiber Foods*, 402 F.3d at 1204 & n.6 (following *CAT Contracting* but rejecting plaintiff's alternative argument that case could have continued under Rule 25(c) even if plaintiff never reacquired requisite stake in the litigation).

*Id.* at 581 (emphasis in original). The *Qimonda* Court therefore granted LSI's motion to dismiss pursuant to Rule 12(b)(1). *Id.*

The Court, having reviewed *Schreiber Foods*, *Quimonda*, and the Supreme Court and circuit court cases cited therein, finds that the legal authority cited in these cases counsels against grant of Roxane's Motion to Dismiss. In opposing this conclusion, Roxane makes two primary

arguments, which the Court will address below in setting out the reasoning for its decision.

### b. The Relative Timing of Abbott's Motion to Substitute Is Not Dispositive

First, Roxane argues that the "fundamental and undisputed fact" that "Abbott lacked standing *at the time of the Roxane's jurisdictional challenge*" "controls the instant inquiry and warrants dismissal." (D.I. 41 at 3 (emphasis in original); *see also* D.I. 37 at 1 ("Abbott filed a motion to substitute AbbVie as a plaintiff, but only *after* Roxane filed its motion to dismiss and after Abbott conceded that it no longer possesses any rights in the patents-in-suit.") (emphasis in original)) Thus, according to Roxane, Abbott's filing of the Motion to Substitute mere hours after the filing of Roxane's Motion to Dismiss, militates that the case be dismissed. (D.I. 37 at 1 ("Abbott's motion, filed in the evening hours and after the filing of a jurisdictional challenge via Roxane's Motion to Dismiss, is too little, too late."))

The Court finds that Roxane's emphasis on the timing of the jurisdictional challenge in relation to the Motion to Substitute is misplaced. As described above, the *Schreiber Foods* Court did not indicate in any way that the *sequence* of these events was relevant. Instead, the *Schreiber Foods* Court stated only that "[i]n circumstances where dismissal for lack of initial standing is not required, the Supreme Court [has] held that jurisdictional defects *can be cured before judgment*" and that "that the temporary loss of standing during patent litigation *can be cured before judgment." Schreiber Foods*, 402 F.3d at 1203-04 (emphasis added) (citations omitted). As a result, Schreiber Foods was able to "reacquire[] its stake in the litigation by reacquiring the [first patent] (and causes of action thereunder) before the entry of judgment" and in this way cure the jurisdictional defect. *Id.* at 1204.

19

While the *Schreiber Foods* Court was confronted with a factual situation that is different than the situation at bar, the broader rationale underlying the decision—that jurisdictional defects may be cured before judgment—is still relevant to this dispute. Indeed, in *Affinion Loyalty Grp., Inc. v. Maritz, Inc.*, No. Civ. A. 04-360-JJF, 2006 WL 1431065, at *1-3 (D. Del. May 22, 2006), this Court found that where a plaintiff filed its complaint for patent infringement at a time when it owned the patents-in-suit—then later assigned its rights in the patents-in-suit to an acquiring company during the litigation— the plaintiff could thereafter validly substitute the acquiring company pursuant to Rule 25(c). The Court did so, citing to *Schreiber Foods* for support, even though the defendant had filed a motion to dismiss for lack of subject matter jurisdiction *before* the plaintiff moved to cure the lack of subject matter jurisdiction pursuant to Rule 25(c). *Id.* at *1 ("A court, which temporarily lacks subject matter jurisdiction due to a plaintiff's lack of standing, may regain jurisdiction if the original plaintiff had Article III standing and there is a way to cure the deficiency. In patent cases, joinder or substitution of an assignee of all rights, title and interest in the patents-in-suit is permissible under [Rule] 25(c) to cure a lack of standing.") (citing *Schreiber Foods*, 402 F.3d at 1203).[8]

Moreover, *Corbin v. Blankenburg*, 39 F.3d 650 (6th Cir. 1994) (en banc), a case cited approvingly by the *Schreiber Foods* Court, arose in a factual scenario similar to the one at issue here. *Schreiber Foods*, 402 F.3d at 1204 (citing *Corbin*, 39 F.3d at 654). In *Corbin*, as noted

---

[8]     In another similar post-filing assignment case, where the motion to substitute was filed before the motion to dismiss, this Court held that both motions must be considered simultaneously, and did not indicate that the relative timing of the motions' filing was dispositive. *Gen. Battery Corp. v. Globe-Union, Inc.*, 100 F.R.D. 258, 260 (D. Del. 1982) ("[Declaratory judgment plaintiff's] motion to dismiss as a response to [patentee's] Rule 25(c) motion mandates joint treatment of both motions.").

20

above, the original plaintiff and current trustee of a pension benefit plan brought suit against a group of defendants for alleged losses to that pension plan. 39 F.3d at 651. After bringing suit, the original plaintiff resigned his trusteeship and was replaced a few months later by another person, however the original plaintiff remained as the only named plaintiff in the case. *Id.* Subsequently, the defendants moved to dismiss pursuant to Rule 12(b)(1) on the theory that the named plaintiff who brought the ERISA litigation "lost standing to continue the lawsuit when he resigned as trustee, and that the district court irretrievably lost subject matter jurisdiction" of the case once he ceased to qualify as a person entitled to bring an ERISA action under the statute. *Id.* at 652. "*[T]hree working days after the filing of the defendants' motion to dismiss*" the original plaintiff moved under Rule 25(c) to substitute the replacement trustee in his stead. *Id.* (emphasis added). The district court, after hearing oral argument on the motions, ruled that it was required to "ignore[]" the motion to substitute because, in its view, the court lost subject matter jurisdiction over the case as soon as the original plaintiff resigned as trustee. *Id.* On appeal, the *Corbin* Court overturned this result, finding instead that substitution could be accomplished because "subject matter jurisdiction was not irretrievably lost the moment [the original plaintiff] resigned his trusteeship" and "[s]ubject matter jurisdiction, once it validly exists among the original parties, remains intact after substitution." *Id.* at 654 (internal quotation marks and citations omitted).

In light of these precedents, the Court declines to find the timing of the filing of Roxane's Motion to Dismiss and the Motion to Substitute to be dispositive.[9] Therefore, the Court will

---

[9]     In this respect, the Court declines to follow the *Qimonda* Court's suggestion to the contrary. *See Qimonda*, 857 F. Supp. 2d at 581 (distinguishing its case from prior Federal Circuit precedent on the basis that in the prior Federal Circuit case "the jurisdictional challenge

consider Roxane's Motion to Dismiss and the Motion to Substitute together, without regard to the timing of the filing of the motions.

### c.  Rule 25(c) Can Be Used to Cure a Jurisdictional Defect

In its briefing and at oral argument, Roxane also argued, regardless of the timing issue, that "Rule 25(c) is a procedural vehicle that cannot retroactively confer jurisdiction on Abbott from the date of the assignment until the filing of the Motion to Substitute." (D.I. 41 at 4) Roxane argues that to allow Rule 25(c) to cure a defect in jurisdiction would be impermissible in light of 28 U.S.C. § 2072 ("Section 2072") and Federal Rule of Civil Procedure 82. (*Id.*; D.I. 37 at 4; *see also* D.I. 33 at 5 n.3)  Section 2072(b) states that "[the Federal Rules of Civil Procedure] shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b).  Similarly, Federal Rule of Civil Procedure 82 states the Rules "do not extend or limit the jurisdiction of the district courts."  Thus, in Roxane's view, once Abbott ceased to have an interest in the litigation the Court irretrievably lost subject matter jurisdiction, and Rule 25(c) cannot be validly used to restore jurisdiction. (D.I. 59 at 78, 80)

The Court finds to the contrary, as our Court and other courts have held that "the better characterization" of the circumstances at issue here "is that subject matter jurisdiction remained and only ownership of the chose in action was transferred." *Gen. Battery Corp. v. Globe-Union, Inc.*, 100 F.R.D. 258, 262 (D. Del. 1982); *see also LBS Innovations LLC v. Aaron Brothers, Inc.*, Case Nos. 2:11-cv-142, 2:11-cv-407, 2:11-cv-409 (D.I. 287 at 4) (E.D. Tex. Sept. 20, 2012) ("Any defect in standing that existed after LBSI New Jersey relinquished its rights to LBSI Texas

---

occur[red] *after* the party holding all substantial rights ha[d] been joined") (citing *Insituform*, 385 F.3d 1371-72) (emphasis in original).

22

is cured by the substitution of LBSI Texas as plaintiff. This is not a situation in which a substitution would be the equivalent of initiating a new lawsuit with a new plaintiff in a new cause of action. Rather, the composition and interests in this litigation remain unchanged with the substitution by LBSI Texas.") (citing *Schreiber Foods*, 402 F.3d at 1204).[10] Understood in this way, the use of Rule 25(c) to cure a jurisdictional defect does not inappropriately modify any substantive right or extend the jurisdiction of the district courts. *United Access Techs., LLC v. EarthLink, Inc.*, Civil Action No. 02-272-MPT, 2012 WL 2175786, at *4 (D. Del. June 14, 2012). The rule instead is procedural, one designed to "facilitate[]s the conduct of a case" by "allow[ing] an action to continue unabated when an interest in a lawsuit changes hands, avoiding the need to initiate a new action." *Id.* (citing *Gen. Battery Corp.*, 100 F.R.D. at 261-63). In other words, "Rule 25(c) permits the court to continue to hear a case where the action survives but the original party has transferred interest in the litigation to another." *Gen. Battery Corp.*, 100 F.R.D. at 262. In this way, Rule 25(c) does not change the parties' entitlements to relief, as these entitlements could be litigated in a newly filed lawsuit, it merely "alter[s] . . . how the claims are processed[.]" *Cf. Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1443 (2010) (discussing Rules 18, 20 and 42(a)); *see also Minn. Mining & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1262 (Fed. Cir. 1985) (noting that other circuit courts had validated the use of Rule 25(c) for substitution of a party, even where it destroyed complete diversity of citizenship between the parties, and that these cases impliedly stood for the proposition that "Rule 25(c) does not violate the proscription of Rule 82 that the rules 'not be construed to extend

---

[10]     *But see Qimonda*, 857 F. Supp. 2d at 581 ("Following this course would in fact allow the rules governing the manner and form of litigation . . . to override the substantive constitutional limits on federal judicial power.").

or limit the jurisdiction of the United States district courts'").[11]

Moreover, *Schreiber Foods* supports the above characterization. First, its statement that a

"temporary loss of standing during patent litigation *can be cured before judgment*" provides such

support, in that if a court irretrievably lost subject matter jurisdiction of a patent infringement

claim upon transfer of patent rights then there could be no later possibility for cure. *See*

*Schreiber Foods*, 402 F.3d at 1204 (citing *Insituform*, 385 F.3d at 1371-72) (emphasis added).

Additionally, the *Schreiber Foods* Court's positive citation to *Corbin* also suggests that the

Federal Circuit contemplated that substitution could, in fact, cure a temporary loss of standing.

*See Schreiber Foods*, 402 F.3d at 1204 (citing to *Corbin* and describing it as a case where

"ERISA trustee who resigned lost requisite stake in litigation and could not continue as plaintiff,

but suit could continue because new trustee was *substituted* as plaintiff five days later")

(emphasis added).

---

[11]     In this regard, the Court disagrees with Roxane's interpretation of Rule 25(a) (and
the resulting implications its ascribes to the meaning of Rule 25(c)). Rule 25(a) allows for
substitution in case of death only if "a party dies *and the claim is not extinguished*[.]" Fed. R.
Civ. P. 25(a) (emphasis added). Roxane's suggests that this latter requirement of Rule 25(a)
inherently builds in a requirement that the named parties must still have a personal stake in the
claims at the time of the filing of the motion to substitute. (*See* D.I. 59 at 28-29, 31-32; *see also*
D.I. 41 at 5 n.3) However, the Court believes that this portion of Rule 25(a) simply requires that
the particular type of claim at issue (e.g., remedial or penal) must be able to survive the death of a
party. *See, e.g., Jimenez-Rodoli v. Dist. 15 Machinist's Union*, No. 10 Civ. 8378(RJS)(KNF),
2011 WL 4494555, at *1 (S.D.N.Y. Sept. 27, 2011) ("A court must look to the nature of the
cause of action for which the suit is brought, to determine whether a claim survives, or is
extinguished upon the death of a party . . . . Unless a statute directly addresses the issue, courts
are generally guided by principles of federal common law, which prescribe that claims
characterized as 'penal' abate upon a party's death, while claims characterized as 'remedial'
survive.") (internal quotation marks and citation omitted). If Rule 25(a) was to be construed as
Roxane suggested, then it would be a nullity, because once a plaintiff died, "there would no
longer be adverse parties presenting a case or controversy to the court [and t]hose who under
state law would be entitled to continue the deceased party's action would be forced to initiate a
new action." *Gen. Battery Corp.*, 100 F.R.D. at 262.

24

Finally, to the extent that Roxane is relying on footnote 6 of *Schreiber Foods* to argue

that the Federal Circuit had "grave doubts" as to the capability of *substitution* under Rule 25(c) to

cure a deficiency in a party's standing, the Court is not convinced. (*See* D.I. 41 at 3 n.1 ("In a

footnote, the [*Schreiber Foods* Court] also expressed 'grave doubt' that Federal Rule of Civil

Procedure 25(c) could be used as a vehicle to maintain an action in which the patentee had lost

standing.") (citation omitted); D.I. 59 at 18-20)  The Court interprets this footnote as merely

expressing uncertainty as to Schreiber Foods' argument that Rule 25(c) would permit it to

"continue as the *sole plaintiff*" after assignment without taking any further action—and not in any

way expressing doubts as to the capability of Rule 25(c) to cure a temporary lack in standing by

substitution of a party. *See Schreiber Foods*, 402 F.3d at 1204 n.6 (emphasis added).[12]

For all of these reasons, the Court finds that Rule 25(c) may be used to cure a lack of

standing incurred after the filing of the complaint as long as the claims survived the assignment.

*See Affinion*, 2006 WL 1431065, at \*1; *Gen. Battery Corp.*, 100 F.R.D. at 261.

### 3.  Conclusion

As described above, in this case it is undisputed that when the original Complaint was

filed, Abbott was the owner of the patents-in-suit and that it had standing to sue. (D.I. 33 at 1-3;

---

[12]     Indeed, this is what Schreiber Foods had argued to the Federal Circuit—that even
if it lacked standing because of the transfer of rights, it could have been entitled to continue as
the sole plaintiff in the suit had it never taken any other action.  Reply Brief for Plaintiff-
Appellant Schreiber Foods, Inc., *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198
(Fed. Cir. 2005) (Nos. 04-1279, 04-1314), 2004 WL 3763638, at \*11-15 ("[T]here is no
requirement that a transferee must be substituted as the plaintiff after a transfer of interest.").
Thus, regardless of what position the Federal Circuit would ultimately take in that scenario (in
light of the language of Rule 25(c)), the Court disagrees with the *Qimonda* Court's analysis of
this footnote as being an expression of "'grave doubt' that the *Rule 25(c) substitution vehicle*
may be invoked to continue an action at the time the plaintiff has lost standing to sue."
*Qimonda*, 857 F. Supp. 2d at 581 (emphasis added).

D.I. 38 at 5, 7-8; D.I. 41 at 1-3) It is also undisputed in this case that on August 1, 2012, Abbott assigned legal title to the patents-in-suit (including the right to sue for past, present and future infringement) to AbbVie. (D.I. 33 at 1-3; D.I. 38 at 5, 7-8; D.I. 41 at 1) Thus, the Court finds that Abbott's claims have survived the assignment to AbbVie. *See Gen. Battery Corp.*, 100 F.R.D. at 261 (finding patent infringement counterclaim survived assignment when the assignment included the right to sue for prior infringements incurred by the prior assignee). With no other challenge to the appropriateness of substitution before it, the Court recommends that Abbott's Motion to Substitute pursuant to Rule 25(c) be granted, and that Roxane's Motion to Dismiss be denied.

### B. The Motion to Transfer

#### 1. The "First-Filed" Rule

##### a. Standard of Review

The Federal Circuit has adopted what is known as the "first-filed" rule in patent cases, "intended to avoid conflicting decisions and promote judicial efficiency, that generally favors pursuing only the first-filed action when multiple lawsuits involving the same claims are filed in different jurisdictions." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1299 (Fed. Cir. 2012); *see also Genentech, Inc. v. Eli Lilly and Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993), *rev'd on other grounds, Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995). If applied, the rule counsels that a later-filed action involving the same patent controversy should be dismissed, transferred, or otherwise enjoined in favor of the first-filed action. *See Merial Ltd.*, 681 F.3d at 1299; *Genentech*, 998 F.2d at 938. This rule serves to "prevent a multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising from common matters." *Corixa Corp. v. IDEC Pharms.*

*Corp.*, No. Civ. A. 01-615-GMS, 2002 WL 265094, at *1 (D. Del. Feb. 25, 2002) (citing

*Genentech*, 998 F.2d at 937). Exceptions to the rule are not rare and are made when justice or

expediency requires, but there must be "sound reason that would make it unjust or inefficient to

continue the first-filed action." *Genentech*, 998 F.2d at 938. "Such reason may be the

convenience and availability of witnesses, or absence of jurisdiction over all necessary or

desirable parties, or the possibility of consolidation with related litigation, or considerations

relating to the real party in interest." *Id.*[13]

### b. Applicability of the Rule

Roxane argues that this action should be transferred pursuant to the first-filed rule

because the Ohio Action was filed prior to the Delaware Action, and because the Ohio Action

involves the same parties and subject matter as the Delaware Action. (D.I. 14 at 6–9) Abbott

asserts that the first-filed rule does not apply here, arguing that because only two of the five

Delaware patents-in-suit were asserted in Ohio, there is not the requisite identity of issues that

triggers the first-filed rule. (D.I. 16 at 9–11) In any event, Abbott argues that even if the first-

filed rule would otherwise apply, the Court should decline to apply it here. (*Id.* at 12–13)

---

[13]     The Third Circuit also recognizes the first-filed rule. *E.E.O.C. v. Univ. of Pa.*,
850 F.2d 969, 971 (3d Cir. 1988) (internal quotation marks and citations omitted). Our Court has
found that in patent cases, the Federal Circuit's law regarding the rule should apply. *Thales
Airborne Sys. S.A. v. Universal Avionics Sys. Corp.*, No. Civ. 05-853-SLR, 2006 WL 1749399, at
*4 (D. Del. June 21, 2006) (applying Federal Circuit law to first-filed analysis as to "co-pending
patent infringement and declaratory judgment actions . . . involving 'the same patents and the
same parties'") (quoting *Lab. Corp. of Am. Holdings v. Chiron Corp.*, 384 F.3d 1326, 1330 (Fed.
Cir. 2004)); *see also Woodbolt Distribution, LLC v. Natural Alternatives Int'l, Inc.*, Civil Action
No. 11-1266 GMS, 2013 WL 247041, at *2 & n.2 (D. Del. Jan. 23, 2013); *Ivoclar Vivadent AG
v. 3M Co.*, Civil Action No. 11-1183-GMS-SRF, 2012 WL 2374657, at *3 (D. Del. June 22,
2012). Thus, the Court will apply Federal Circuit law and this District's precedent interpreting
such law here.

The Court finds that, in line with the precedent of this Court, the first-filed rule does not apply to Roxane's motion. Although the parties to Ohio Action and the Delaware Action are in essence the same, and there will be significant commonalities of fact and law among the two suits, the subject matter of the suits are different enough to render the first-filed rule inapplicable.

As noted above, there are three patents asserted in the Delaware Action that have not been asserted in the Ohio Action. In this Court, judges "have tended to adhere to the first-filed rule in circumstances where the patents-in-suit among [two] cases were the same, while often declining to find" that the rule applies when the patents in one suit are different from those in the other. *Fuisz Pharma LLC v. Theranos, Inc.*, Civil Action No. 11-1061-SLR-CJB, 2012 WL 1820642, at *5 (D. Del. May 18, 2012); *see also Abbott Labs. v. Johnson & Johnson, Inc.*, 524 F. Supp. 2d 553, 558 (D. Del. 2007) (holding that "it would not be appropriate to apply the first-filed rule to [two co-pending actions] because those cases involve different patents"); *Thales Airborne Sys. S.A. v. Universal Avionics Sys. Corp.*, No. Civ. 05-853-SLR, 2006 WL 1749399, at *4 (D. Del. June 21, 2006) (noting that the "application" of the first-filed rule "seems limited to actions involving the same patents" and suggesting rule did not apply, where second-filed action in District of New Jersey included claims regarding two additional patents) (internal quotation marks and citation omitted).[14] In the present case, the patents themselves are not merely

---

[14]     Of the cases cited by Roxane where our Court found the first-filed rule applicable, only one involved two cases that implicated different patents—*Corixa Corp. v. IDEC Pharms. Corp.*, No. CIV. A.01-615-GMS, 2002 WL 265094 (D. Del. Feb. 25, 2002). (D.I. 17 at 3; D.I. 28 at 11–12) In that case, this Court applied the first-filed rule and found that it "weigh[ed] heavily in favor of transfer" where an earlier-filed declaratory judgment action in Southern District of California involved six patents, and a later-filed patent infringement suit in this District involved only three of those six patents. *Id.* at *1-2. As that brief description reveals, *Corixa* is distinguishable from the present facts. While here the Ohio Action is completely subsumed within the Delaware Action (such that the Delaware Action involves all of the Ohio

different—there are also three substantive differences among those patents which further confirm that the first-filed rule should not apply.

First, the subject-matter of the Ohio patents-in-suit (the '359 and '752 patents) is different from the additional Delaware patents-in-suit (the '497, '157, and '403 patents). The '359 and '752 patents are both directed primarily to ritonavir compositions. In contrast, the '497 patent is broadly directed to a genus of protease-inhibiting compounds and their pharmaceutically acceptable salts. The claim construction disputes that are likely to arise in connection with the '359 and '752 patents are therefore different from those that will be based on the '497 patent claims. The other two additional Delaware patents (the '157 patent and the '403 patent) consist primarily of method claims that focus not on ritonavir and other protease-inhibiting compounds themselves, but rather on the pharmokinetics of *in vivo* inhibition of HIV replication. In addition to presenting distinct issues for *Markman*, the '157 and '403 patent claims are also likely to implicate different evidence. (D.I. 28 at 51–52) While the infringement analysis of the composition claims will probably focus on chemical structures, the evidence for the additional Delaware method claim patents will likely focus on chemical activity or behavior. *Cf. APV N. Am., Inc. v. Sig Simonazzi N. Am., Inc.*, 295 F. Supp. 2d 393, 397 (D. Del. 2002) (declining to

---

patents-in-suit plus three additional patents), in *Corixa* the converse was true (such that the *Corixa* Delaware action was completely subsumed by the *Corixa* California action). Thus, in *Corixa*, it could be said that the principles informing the first-filed rule's existence—preventing a needless multiplicity of actions and achieving resolution in a single lawsuit of all disputes arising from common matters—would be served by considering the California action to be "first-filed," since all of the claims, discovery, and *Markman* issues in the second-filed action would necessarily proceed in the first-filed action. The same can not be said of Abbott's claims for the additional Delaware patents-in-suit; there are no claims for the '497 patent, '157 patent, or '403 patent currently pending in the Ohio Action. Thus, *Corixa* does not require the Court to apply the first-filed rule to the present case.

apply the first-filed rule where the second-filed suit involved a motion seeking a declaratory judgment of non-infringement and invalidity of five patents in first-filed suit, plus two additional patents, and infringement claims regarding two more additional patents, as certain of the additional patents "involve[d] the entire structure of a bakery conveyor," while patents that were at issue in the first case "deal[t] more specifically with the magnetic grids" associated with that conveyor, such that "while the inventions are not entirely unrelated, they do involve different technologies and thus, different facts"); *Thales*, 2006 WL 1749399, at *4 (noting that although all patents pending in two separate actions involved the same technology, certain of those patents "arguably involve[d] different aspects of this broad category of technology").

Second, none of the eight inventors who are listed on the Ohio patents-in-suit are also named inventors on any of the additional Delaware patents-in-suit. This is unsurprising, given that neither of the Ohio patents-in-suit are from the same patent family as any of the additional Delaware patents-in-suit. *See, e.g.*, *Garmin Ltd. v. TomTom, Inc.*, No. 2:06CV338, 2007 WL 708587, at *2–3 (E.D. Tex. Mar. 5, 2007) (declining to apply the first-filed rule where two actions involved separate patents from different families and where the patents in one suit had a different specification from the patents in the other suit). As such, the discovery surrounding the additional Delaware patents-in-suit would focus in part on the seven inventors of those patents, who had nothing to do with the Ohio patents-in-suit.

Third, the scope of the prior art available regarding efforts to invalidate the Ohio patents-in-suit is different from that available for the other Delaware patents-in-suit. The earliest possible priority date for the '359 patent appears to be in 1998. In contrast, the '497 patent's earliest possible priority date appears to be in 1989. Thus, a significant amount of additional

30

prior art material is potentially relevant to the invalidity inquiry in the Ohio Action.

Roxane repeatedly cites Abbott's characterizations of the two pending suits in support of its position that the first-filed rule should apply here. For instance, Roxane contends that in previously arguing that the Ohio Action should be transferred to and consolidated with this case, "Abbott admit[ted] that the [two] 'actions involve common questions of fact,' and that transfer and consolidation 'will avoid the possibility of inconsistent judicial determinations concerning . . . the '359 and '752 patents.'" (D.I. 14 at 9; *see also* D.I. 17 at 6; D.I. 28 at 18–19) The Court agrees with Roxane that it is also indisputably true that there are many "common questions of fact" among the Ohio patents-in-suit and the additional Delaware patents-in-suit—strong commonalities that (even if the '359 and '752 patents are dismissed from this case) would surely exist if the two cases went forward in different courts. These commonalities can have real relevance in the Section 1404(a) transfer analysis, which, while allowing for deference to a plaintiff's choice of forum, also asks in part whether "practical considerations"—like the existence of the Ohio Action and any efficiencies gained from having one court oversee cases that share such commonalities—nevertheless militate in favor of transfer.

However, the application of the first-filed rule is meant to identify cases that, if not mirror images of each other, are so indistinguishable that, in essence, they can be said to arise from the "same set of facts." *Sig Simonazzi,* 295 F. Supp. 2d at 397; *see also Fuisz Pharma LLC,* 2012 WL 1820642, at \*5-7 (finding first-filed rule applicable in circumstance involving two suits that each implicated the same patent, even where the legal claims in the suits were not identical, as those legal claims were "extremely similar" and stemmed from the "same subject matter and the same nucleus of operative facts"). If the rule *is* deemed applicable (and no exceptions apply), its

31

impact is necessarily powerful—it ends the inquiry as to whether the second-filed case can go forward in this District, and then simply asks whether that case should be dismissed, transferred or enjoined. Under the established precedent of this District, the rule should not be applied in a case like this, where despite the presence of real factual and legal overlap between the two actions, there are also some real factual and legal differences.

## 2. The Section 1404 Analysis

Although the Court has found that the first-filed rule does not apply here, that finding does not resolve the question of whether this case should be transferred to the Southern District of Ohio. Roxane argues that it should; Abbott contends that the Ohio Action should move forward on the Ohio patents-in-suit, while the Delaware Action should proceed as to the three patents that are only asserted in this forum (while the claims here against the Ohio patents-in-suit should be dismissed).

## 1. Appropriateness of Transferee Venue

Section 1404(a) of Title 28 provides the statutory basis for a transfer inquiry. It provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Here there appears to be no dispute that Abbott could have brought the Delaware Action in the Southern District of Ohio. (D.I. 14 at 11) In any event, the Court finds that the Southern District of Ohio would be an appropriate venue for the suit, because, *inter alia*, Roxane resides there and has a regular and established place of business there. (D.I. 14, Declaration of Verner Bennett Miller (hereinafter, "Miller Decl.") at ¶¶ 1–2); *see also* 28 U.S.C. § 1400(b)).

32

## 2. Applicable Legal Standards

"[S]ection 1404(a) was intended to vest district courts with broad discretion to determine, on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 883 (3d Cir. 1995) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 30–31 (1988)). In two seminal cases regarding the transfer inquiry, *Shutte v. Armco Steel Corp.*, 431 F.2d 22 (3d Cir. 1970) and *Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995), the Third Circuit clearly emphasized the hurdle that a defendant faces when it seeks to have a matter transferred to another jurisdiction pursuant to Section 1404(a). The Third Circuit explained that "courts normally defer to a plaintiff's choice of forum" and thus "the plaintiff's choice of venue should not be lightly disturbed." *Jumara*, 55 F.3d at 879-880 (internal quotation marks and citation omitted). This general principle, drawn from the historic respect accorded a plaintiff's choice of venue, suggests that a transfer is not to be liberally granted. *Shutte*, 431 F.2d at 25 (citing *Ungrund v. Cunningham Bros., Inc.*, 300 F. Supp. 270, 272 (S.D. Ill. 1969)).

The party seeking a transfer has the burden "to establish that a balancing of proper interests weigh[s] in favor of the transfer." *Id.*; *see also Jumara*, 55 F.3d at 879. That burden is a heavy one: "unless the balance of convenience of the parties is *strongly in favor of defendant*, the plaintiff's choice of forum should prevail." *Shutte*, 431 F.2d at 25 (internal quotation marks and citation omitted) (emphasis added); *see also CNH Am. LLC v. Kinzenbaw*, C.A. No. 08-945(GMS), 2009 WL 3737653, at *2 (D. Del. Nov. 9, 2009). Accordingly, "transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer." *Angiodynamics, Inc. v. Vascular Solutions, Inc.*, C.A. No. 09-554-JJF, 2010 WL 3037478, at *2

33

(D. Del. July 30, 2010); *see also Illumina, Inc. v. Complete Genomics, Inc.*, Civil Action No. 10-649, 2010 WL 4818083, at *2 (D. Del. Nov. 9, 2010).

The Third Circuit has observed that, in undertaking this transfer analysis, "there is no definitive formula or list of . . . factors to consider." *Jumara*, 55 F.3d at 879. Instead, courts must analyze "all relevant factors" to determine whether "the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Id.* Nevertheless, in *Jumara*, the Third Circuit identified a set of private interest and public interest factors that should be taken into account in this analysis (the "*Jumara* factors"). The private interest factors to consider include:

> [1] [The] plaintiff's forum preference as manifested in the original choice, [2] the defendant's preference, [3] whether the claim arose elsewhere, [4] the convenience of the parties as indicated by their relative physical and financial condition, [5] the convenience of the witnesses—but only to the extent that the witnesses may actually be unavailable for trial in one of the fora . . . and [6] the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

*Id.* at 879. The public interest factors to consider include:

> [1] [T]he enforceability of the judgment, [2] practical considerations that could make the trial easy, expeditious, or inexpensive, [3] the relative administrative difficulty in the two fora resulting from court congestion, [4] the local interest in deciding local controversies at home, [5] the public policies of the fora, . . . and [6] the familiarity of the trial judge with the applicable state law in diversity cases.

*Id.* at 879–80. The Federal Circuit has indicated that district courts should explicitly consider each of these *Jumara* factors, at least to the extent that the parties make "arguments" about them. *In re Link_A_Media Devices Corp.*, 662 F.3d 1221, 1224 (Fed. Cir. 2011) (noting that it would

be "improper to ignore" any of the factors in such a circumstance).[15]

### a.    Private Interest Factors

#### i.    Plaintiff's choice of forum

The parties disagree as to the appropriate weight to be given to Abbott's choice of

Delaware as its preferred forum. When analyzing the first *Jumara* private interest factor—the

"plaintiff's forum preference as manifested in the original choice"—the court should not consider

simply the fact of that choice, but the reasons behind that choice. *Pragmatus AV, LLC v. Yahoo!*

*Inc.*, Civil Action No. 11-902-LPS-CJB, 2012 WL 4889438, at *4 (D. Del. Oct. 15, 2012), *report*

*and recommendation adopted by*, 2013 WL 174499 (D. Del. Jan. 16, 2013); *Affymetrix, Inc. v.*

*Synteni, Inc.*, 28 F. Supp. 2d 192, 200 (D. Del. 1998). If those reasons are "rational and

legitimate" then they will "weigh against transfer," as they are likely to support a determination

that the instant case is properly venued in this jurisdiction. *Pragmatus AV, LLC*, 2012 WL

4889438, at *4 (internal quotation marks and citations omitted); *Tessera, Inc. v. Sony Elec. Inc.*,

Civil No. 10-838 (RMB) (KW), 2012 WL 1107706, at *3 (D. Del. Mar. 30, 2012); *Intellectual*

*Ventures I LLC v. Altera Corp.*, 842 F. Supp. 2d 744, 753 (D. Del. 2012); *Joint Stock Soc'y*

*"Trade House Descendants of Peter Smirnoff, Official Purveyor to the Imperial Court" v.*

*Heublein, Inc.*, 936 F. Supp. 177, 188 (D. Del. 1996); *cf. In re Amendt*, 169 F. App'x. 93, 96 (3d

Cir. 2006) (citing *Jumara* and, in examining the first two private interest factors, considering that

elements of the claims "arose in each of the two fora [plaintiff's preferred forum and defendant's

---

[15]    In analyzing a motion to transfer in a patent case, the law of the regional circuit (here, the Third Circuit), applies. *Intellectual Ventures I LLC v. Checkpoint Software Tech. Ltd.*, 797 F. Supp. 2d 472, 487 n.7 (D. Del. 2011) (citing *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1331 (Fed. Cir. 2011)).

preferred forum]" at issue regarding the transfer motion, such that the weight given to the factors

effectively cancelled each other out). On the other hand, where a plaintiff's choice of forum is

arbitrary, irrational, or selected to impede the efficient and convenient progress of a case, it

should not be afforded substantial weight. *Affymetrix*, 28 F. Supp. 2d at 200 (noting that if a

plaintiff had no good reason, or an improper reason, for filing suit in this District, this factor

would likely weigh against transfer).

Abbott contends that its choice of Delaware weighs heavily in favor of retaining the

action here. (D.I. 16 at 16-17) Roxane argues, *inter alia*, that Abbott's choice is not entitled to

great weight because "Delaware is not [Abbott's] home and has no relationship whatsoever to the

subject matter of the parties' dispute."[16] (D.I. 14 at 12)

Although Abbott indisputably filed suit in a venue outside its home turf, Abbott contends

that it had legitimate and rational reasons for doing so. Noting that ANDA suits often involve

multiple defendants, and that another unnamed generic challenger had filed an ANDA against the

---

[16]     Abbott has suggested that AbbVie's status as a Delaware corporation should be
taken into account in the transfer analysis if its Motion to Substitute is granted. (D.I. 31)
Roxane, however, has noted that our Court, in *Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d
192 (D. Del. 1998), has held that when a non-Delaware corporate plaintiff files suit and is subject
to a motion to transfer, and thereafter reincorporates in Delaware, the plaintiff should be treated
as a foreign corporation for purposes of the transfer analysis. *Id.* at 194 n.1 (citing cases). More
recently, in *In re EMC Corp.*, 501 Fed. App'x 973 (Fed. Cir. 2013), the Federal Circuit held that
motions to transfer venue "are to be decided based on 'the situation which existed when suit was
initiated[,]'" although a court may consider later-arising judicial economy benefits that "would
have been apparent at the time the suit was filed." *Id.* at 976 (quoting *Hoffman v. Blaski*, 363
U.S. 335, 343 (1960)). Indeed, here, as to at least certain *Jumara* factors, such as "plaintiff's
forum preference as manifested in the original choice[,]" it would make little sense to consider
the effect of AbbVie's entry into the case, as it was Abbott, not AbbVie, who made the "original
choice" to sue in this District. In light of *In re EMC Corp*, and also in light of our Court's
precedent in *Affymetrix* regarding the impact of a very similar procedural circumstance, the Court
finds that it should not consider AbbVie's later entry into the case for purposes of resolving the
Motion to Transfer. *Affymetrix, Inc.*, 28 F. Supp. 2d at 194 n.1.

'359 and '752 patents, Abbott states that it chose to bring suit in a forum that would "facilitate consolidating potential related litigations and reduce personal jurisdiction challenges." (D.I. 16 at 16-17) The Court finds that these are legitimate and rational reasons for Abbott's choice to sue in Delaware.[17] Abbott's choice of forum therefore weighs against transfer.

## ii. Defendant's forum preference

Roxane prefers to litigate this action in the Southern District of Ohio. There are several legitimate reasons to support that preference, which include: (1) Roxane's principal place of business and research and development center are located in that forum (in Columbus, Ohio), (D.I. 1 at ¶ 2; Miller Decl. at ¶ 1); (2) Roxane oversaw the development and manufacturing of its ANDA product in its Columbus, Ohio facilities (Miller Decl. at ¶ 2); (3) Roxane employees who were involved in the development of its ANDA product are located in Columbus, Ohio (id.); and (4) many of Roxane's documents relating to its ANDA and its ANDA product are located in Columbus, Ohio (id. at ¶¶ 3, 5). See, e.g., Fuisz, 2012 WL 1820642, at *12; Microsoft Corp. v. Geotag Inc., 847 F. Supp. 2d 675, 678 (D. Del. 2012); Wacoh Co. v. Kionix Inc., 845 F. Supp. 2d 597, 602 (D. Del. 2012).

This factor weighs in favor of transfer.[18]

---

[17]     Although the Court need not consider it in order to find that this factor weighs against transfer, in a recent filing, Abbott noted that AbbVie has, in fact, recently brought suit against two entities, Hetero USA Inc. and Hetero Labs Limited, that have admitted that this Court has jurisdiction over them. The suit relates to the entities' filing of an ANDA seeking to market a generic copy of Norvir tablets, and involves four of the five patents-in-suit in the Delaware Action. (D.I. 61 at 1-2)

[18]     Abbott did not address this factor in its answering brief, but it did suggest for the first time at oral argument that defendant's forum preference should weigh in Abbott's favor, because the Ohio Action is an "anticipatory suit." (D.I. 28 at 67-68) But as noted above, the Court finds that there are multiple legitimate reasons for Abbott's forum preference. While the

### iii.    Whether the claim arose elsewhere

"[A] claim for patent infringement arises wherever someone has committed acts of infringement, to wit, 'makes, uses, offers to sell, or sells any patented invention' without authority." *Cellectis S.A. v. Precision Biosciences, Inc.*, 858 F. Supp. 2d 376, 381 (D. Del. 2012) (quoting 35 U.S.C. § 271(a)). When assessing where a claim for patent infringement arose, the district court will in part focus on the activity surrounding the production, design and manufacture of the infringing product. *Wacoh Co.*, 845 F. Supp. 2d at 602; *see also Intendis, Inc. v. River's Edge Pharms., LLC*, Civil Case No. 11-2838 (FSH)(PS), 2011 WL 5513195, at *3-4 (D.N.J. Nov. 10, 2011). Yet courts also recognize that it can be said that infringement claims arise whereever the allegedly infringing products are sold. *Cellectis S.A.*, 858 F. Supp. 2d at 381; *Wacoh Co.*, 845 F. Supp. 2d at 602.

However, ANDA cases are based primarily on an act of constructive infringement—namely, the submission to the FDA of an application to sell a generic version of a drug prior to the expiration of the relevant patents. (*See, e.g.*, D.I. 1 at ¶¶ 23, 29); *see also Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997) ("The act of infringement that gives rise to a case or controversy [in an ANDA case] has been stated to be 'artificial,' . . . in the sense that a specific infringing composition has not yet been made, used, or sold, and is thus not necessarily available for a court to compare to the claims.") (citation omitted). In such cases, our Court and other courts have tended to look to the forum where the ANDA submission itself was prepared and submitted, *see, e.g.*, *Pfizer Inc. v. Sandoz Inc.*, Civil Action No. 09-742-JJF, 2010

---

weight of the "anticipatory suit" itself in the transfer calculus is discussed below, the Court finds that Roxane's preference to litigate on its home turf is legitimate, rational, and entitled to weight.

WL 256548, at *5 (D. Del. Jan. 20, 2010); *Pfizer Inc. v. Apotex, Inc.*, Civil Action No. 08-cv-948-LDD, 2009 WL 2843288, at *3 n.5 (D. Del. Aug. 13, 2009); *Pfizer Inc. v. Synthon Holding, B.V.*, 386 F. Supp. 2d 666, 675–76 (M.D.N.C. 2005), or to where the ANDA product was developed, *see e.g.*, *Bristol-Meyers Squibb Co. v. Andrx Pharms., LLC*, No. 03 Civ. 2503(SHS), 2003 WL 22888804, at *3 (S.D.N.Y. Dec. 5, 2003).

The actions relating to the preparation and filing of Roxane's ANDA occurred in the Southern District of Ohio, as did some significant portion of the development of Roxane's ANDA product. (Miller Decl. at ¶¶ 2–5) Abbott did not discuss this factor in its Answering Brief, and appears to concede that the operative facts giving rise to the litigation occurred in the Southern District of Ohio (and that none occurred in Delaware). (*See, e.g.*, D.I. 28 at 66 (Abbott's counsel noting that "[t]echnically speaking the operative fact that gave rise to this case is the filing of their Paragraph IV certifications with the FDA. That's really artificial, yes, but still the act of infringement that gave rise to this case.")) Because the operative events giving rise to the Plaintiff's claim of infringement have a strong connection to the Southern District of Ohio (and no articulated connection to Delaware), this factor weighs in favor of transfer.

### iv. Convenience of the parties as indicated by their relative physical and financial condition

In assessing "the convenience of the parties as indicated by their relative physical and financial condition," this Court has traditionally looked to: (1) the parties' physical location; (2) the associated costs to the parties' employees in traveling to Delaware (as opposed to the proposed transferee district) for litigation purposes; and (3) the relative ability of each party to bear these costs in light of its size and financial wherewithal. *Fuisz*, 2012 WL 1820642, at *12;

39

*Microsoft Corp.*, 847 F. Supp. 2d at 678; *L'Athene, Inc. v. EarthSpring LLC*, 570 F. Supp. 2d 588, 595 (D. Del. 2008).

Neither Abbott or Roxane is physically located in Delaware. Although Roxane is registered to do business in Delaware and has a registered agent in Delaware, (D.I. 16, ex. I at 5), there is no evidence that either party has any facilities, offices, or physical plants in Delaware. In contrast, at least Roxane's research and development center is located in the transferee forum. (Miller Decl. ¶¶ 1–2) Moreover, although Abbott is based in Illinois, it also "operates extensively in Columbus, Ohio." (D.I. 20, ex. A at 1; D.I. 28 at 39)

Although it is always an inherently speculative exercise at this stage of litigation to predict which employees of either side may have to travel to Delaware for litigation purposes (if this case were to proceed here), it is possible that the inventors of the patents-in-suit (from Abbott) and the Roxane employees involved in the development of the ANDA product will need to travel here at some point. These likeliest Abbott witnesses appear to be from Illinois, because ritonavir was apparently discovered by Abbott scientists working in Chicago, and because nearly all the named inventors of the Delaware patents-in-suit were (at least at the time the patents issued) residents of Illinois. (*See, e.g.*, D.I. 14, ex. 6; *see also* D.I. 8, exs. A–E) Chicago and other portions of Illinois are, obviously, much closer to the Southern District of Ohio than to Wilmington, Delaware. As for Roxane, its employees who were involved in the development of the ANDA product are all based in the Southern District of Ohio, such that they are "essentially down the street" from the federal courthouse in that jurisdiction, but are a more significant

40

distance from Delaware.[19]  (D.I. 28 at 36)

The likelihood that these witnesses would actually have to engage in travel to Delaware would be greater if the case goes to trial. *See, e.g., Human Genome Sciences, Inc. v. Genentech, Inc.*, C.A. Nos. 11-082-LPS, 11-156-LPS, 11-328-LPS, 2011 WL 2911797, at \*7 (D. Del. July 18, 2011) (noting that the likelihood that few case events would occur in Delaware—particularly few if the case did not go to trial—weighed against transfer, as did technological advances that allow traveling employees to more easily interact with their office while traveling).  Yet due to the nature of ANDA litigation, it is also a fair inference that this case is more likely to go to trial as compared to other patent cases. *See IpVenture, Inc. v. Acer, Inc.*, 879 F. Supp. 2d 426, 433 (D. Del. 2012) (noting that "numerous ANDA cases . . . go to trial in Delaware").

The record does not contain a great deal of evidence as to the ability of the parties to bear these costs in light of their respective size and financial wherewithal.  Yet Abbott has represented (and Roxane has not disputed) that both companies "are large, international corporations and frequent parties in suits before the Delaware courts." (D.I. 16 at 17; *id.*, ex. J (Roxane marketing

---

[19]      In supplemental filings, it became clear that while all of Roxane's employees who were involved in the development and manufacturing of its ritonavir product were located in Columbus, Ohio, "some activity such as contract manufacturing relating to the ANDA product took place in India." (D.I. 47 at 2; *see also* D.I. 46 at 2)  It is unclear to the Court whether any contract employees in India would be needed to testify in the forum of this litigation.  Yet for purposes of this *Jumara* factor, it appears fairly clear that *Roxane's* "entire operation is in Ohio[,]" that all *Roxane employees* who were involved in the proposed ANDA product's development are all located in the proposed transferee district, and that it is those employees whom Roxane would be most likely to call as trial witnesses related to its ANDA product. (D.I. 28 at 34-36; D.I. 59 at 100, 113; D.I. 14, ex. 4 at ¶¶ 3-4); *cf. United States v. Ohio Art Co.*, Civil Action No. 10-230, 2010 WL 3155160, at \*3 (W.D. Pa. July 30, 2010) (noting that while accused product was manufactured overseas, and distributed from other states, "[r]elevant witness testimony is likely to encompass the patents, markings, marketing, and distribution of [the product, and that] [s]uch testimony will be provided largely by current and former employees of [defendant], who are working and residing in [proposed transferee district]").

41

materials indicating that its products have worldwide scope and affect the "lives of millions"))

This supports the inference that both parties would be more easily able to shoulder additional

financial costs associated with bringing their employees to Delaware (as opposed to the Southern

District of Ohio), as compared to the burden such cost might place on a smaller company. *Cf.*

*Robocast, Inc. v. Apple, Inc.*, Civil Action Nos. 11-235-RGA, 10-1055-RGA, 2012 WL 628010,

at *2 (D. Del. Feb. 24, 2012) (finding that party's status as a "large and powerful corporation"

was relevant to its relative ability to shoulder attendant litigation costs associated with travel to

District of Delaware); *Microsoft Corp.*, 847 F. Supp. 2d at 678 (same).

The parties' relative size and financial status may mute the impact of the burden here.

However, in light of the geographical proximity of the Southern District of Ohio to both parties,

there is a reasonable chance that some number of party employees would be required to face

some amount of additional inconvenience and cost were the case to proceed in Delaware (as

opposed to the proposed transferee district) during this litigation. For that reason, the Court finds

that this factor favors transfer.

### v.  Convenience of the witnesses to the extent that they may actually be unavailable for trial in one of the fora

The "convenience of the witnesses" is the next *Jumara* factor, but it is relevant "only to

the extent that the witnesses may actually be unavailable for trial in one of the fora." 55 F.3d at

879. "[I]n reviewing a motion to transfer, courts frequently look to the availability of witnesses

as an important factor, as it can be relevant to protecting a defendant's opportunity to put on its

case with witnesses who will appear in person at the trial." *ADE Corp. v. KLA-Tencor Corp.*,

138 F. Supp. 2d 565, 569 (D. Del. 2001). In explaining how the concerns implicated by this

factor relate to the different types of witnesses who might testify at trial, this Court has noted:

> Party witnesses or witnesses who are employed by a party carry no weight
> in the "balance of convenience" analysis since each party is able, indeed,
> obligated to procure the attendance of its own employees for trial. . . .
> Expert witnesses or witnesses who are retained by a party to testify carry
> little weight in determining where the "balance of convenience" lies
> (especially in an action for patent infringement) because they are "usually
> selected [on the basis] of their reputation and special knowledge without
> regard to their residences and are presumably well compensated for their
> attendance, labor and inconvenience, if any." . . . Fact witnesses who
> possess first-hand knowledge of the events giving rise to the lawsuit,
> however, have traditionally weighed quite heavily in the "balance of
> convenience" analysis.

*Affymetrix,* 28 F. Supp. 2d at 203 (citations omitted). Of particular concern, then, are fact

witnesses who may not appear of their own volition in the venue-at-issue and who could not be

compelled to appear in either Delaware or Ohio by subpoena pursuant to Federal Rule of Civil

Procedure 45. *ADE Corp.*, 138 F. Supp. 2d at 569; *Affymetrix,* 28 F. Supp. 2d at 203.

      The Court does not believe this factor meaningfully favors either side. Neither party has

made, nor really even attempted to make, a showing that any witness (let alone a non-party

witness) would likely be unavailable for trial in this forum. (D.I. 14 at 15; D.I. 16 at 18; D.I. 17

at 9; D.I. 28 at 38) Absent some showing that any such individuals would be unlikely to testify

in this District (as opposed to the Southern District of Ohio), neither side can credibly claim that

this factor should turn in its favor. *See, e.g., Pragmatus AV, LLC*, 2012 WL 4889438, at \*10;

*Tessera, Inc.*, 2012 WL 1107706, at \*6 (citing cases); *Carl Zeiss Meditec, Inc. v. XOFT, Inc.*,

C.A. No. 10-308-LPS-MPT, 2010 WL 4024603, at \*2 (D. Del. Oct. 13, 2010); *ADE Corp.*, 138

F. Supp. 2d at 571.

      This factor is therefore neutral.

### vi.    Location of books and records

Next the Court considers "the location of books and records (similarly limited to the

extent that the files could not be produced in the alternative forum)." *Jumara*, 55 F.3d at 879.

"In patent infringement cases, the bulk of the relevant evidence usually comes from the accused

infringer. Consequently, the place where the defendant's documents are kept weighs in favor of

transfer to that location." *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009) (internal

quotation marks and citation omitted).  This factor is commonly given little weight, however,

because technological advances "have shortened the time it takes to transfer information, reduced

the bulk or size of documents or things on which information is recorded . . . and have lowered

the cost of moving that information from one place to another." *Cypress Semiconductor Corp. &*

*Int'l Microcircuits, Inc. v. Integrated Circuit Sys., Inc.*, No. 01-199-SLR, 2001 WL 1617186, at

*3 (D. Del. Nov. 28, 2001) (internal quotation marks and citations omitted); *see also Cellectis*

*S.A.*, 858 F. Supp. 2d at 382, at *6; *ADE Corp.*, 138 F. Supp. 2d at 571 ("With new technologies

for storing and transmitting information, the burden of gathering and transmitting documents

3,000 miles is probably not significantly more than it is to transport them 30 miles.").  While the

practical reality of these advances in technology may alter the weight given to this factor, a court

must not ignore it entirely.  *Link_A_Media*, 662 F.3d at 1224.

Roxane argues that this factor favors transfer because many documents related to the

research and development of ANDA product are located in the proposed transferee forum. (D.I.

14 at 14; Miller Decl. at ¶ 5)  In response, Abbott notes that although Roxane may have

documents and records in the transferee forum, Roxane has provided no evidence that they

"could not be produced [here] if litigation were to proceed before this Court." (D.I. 16 at 18)

44

On the one hand, there appears to be no dispute that a significant amount of relevant documentation regarding the claims and defenses in this case is located in the Southern District of Ohio. Moreover, some portion of those documents will likely be produced in the Ohio Action, and there may be some minimal efficiency gain in the parties' producing documents relevant to Roxane's ANDA products and Abbott's patents in a single district, not two. *See, e.g., Corixa Corp.*, 2002 WL 265094, at \*4; *Dippold-Harmon Enter., Inc. v. Lowe's Companies, Inc.*, No. 01-532-GMS, 2001 WL 1414868, at \*7 (D. Del. Nov. 13, 2001). Yet on the other hand, even Roxane does not seriously argue that many (or any) of these documents "could not be produced in the alternative forum" (here, Delaware), and indeed, these "records would be able to be produced in whichever forum has the case." *Robocast, Inc.*, 2012 WL 628010, at \*3; *see also* (D.I. 28 at 33-35).

Taking into account the foregoing facts, along with the guidance provided by the Federal Circuit on this question, I find that this factor should favor transfer, but not strongly so, and that it should be given only "marginal weight" in the Court's calculus. *Robocast, Inc.*, 2012 WL 628010, at \*3; *see also Semcon Tech, LLC v. Intel Corp.*, Civil Action Nos. 12-1531-RGA, 12-1534-RGA, 2013 WL 126421, at \*6 (D. Del. Jan. 8, 2013).

## b. Public Interest Factors

### i. Enforceability of judgment

Neither party has offered any reason why a judgment entered in either district would not be given full faith and credit. *See In re DVI Inc.*, No. 03-12656 MFW, Civ. A. 04-170 JJF, 2004 WL 1498593, at \*3 (D. Del. June 23, 2004) (citing *Hechinger Inv. Co. of Delaware, Inc. v. M.G.H.*, 288 B.R. 398, 403 (Bankr. D. Del. 2003)). This factor is neutral.

45

## ii.    Practical considerations that could make the trial easy, expeditious, or inexpensive

The Court next considers the "practical considerations that could make the trial easy, expeditious, or inexpensive." *Jumara*, 55 F.3d at 879. Here, the primary practical consideration at play is the prior existence of the Ohio Action, which, regardless of the outcome of this motion, will proceed as to at least two of the Delaware patents-in-suit. In examining this *Jumara* factor, our Court has often noted that if there is a related lawsuit in one of the fora at issue (even if it is not considered "first-filed") at the time of the transfer motion, this is an important "practical consideration." *Altera*, 842 F. Supp. 2d at 759; *Cashedge, Inc. v. Yodlee, Inc.*, No. Civ. A. 06-170 JJF, 2006 WL 2038504, at *2 (D. Del. July 19, 2006); *Brunswick Corp. v. Precor Inc.*, No. 00-691-GMS, 2000 WL 1876477, at *3 (D. Del. Dec. 12, 2000). If a related case involves "(1) the same parties, (2) related or similar technologies for the judge to become familiar with, and (3) a common field of prior art," then these "practical considerations" weigh in favor of transfer. *Cashedge*, 2006 WL 2038504, at *2.

Here, the Ohio Action involves the same parties, related (though, as discussed above, not identical or "mirror image") technologies and the same accused product. Although the amount of prior art available to invalidate the other Delaware patents is less than that available for the Ohio patents-in-suit, that art is likely to be drawn from a common field. Indeed, there can be no question that the two suits—even were the patents-in-suit in the Ohio Action eliminated from this case—involve common questions of fact and law. In fact, both sides have consistently and repeatedly emphasized this at different times in both litigations. (D.I. 14, ex. 4 at 2 (Abbott noting in Ohio Action that the two "actions involve common questions of fact"); *id.* at brief at 2

46

(Abbott noting that the Ohio Action "will address the same issues of infringement and validity related to the '359 and '752 patents *and will involve overlapping evidence and witnesses with respect '497, '157, and '403 patents not at issue here*") (emphasis added); *id*. at brief at 13 (Abbott arguing in Ohio Action that "although the patents involved in the two actions are not identical, because *all the patents at issue in both actions* relate to the same basic technology and the same accused product (Roxane's generic ritonavir), judicial economy weighs in favor of transfer") (emphasis added); D.I. 28 at 15 (Roxane's counsel noting in instant case that overlap exists, in that "you're dealing with the same ANDA, so the witnesses who are going to talk about the formulation, manufacturing, label of the proposed ANDA product are all the same witnesses on the Roxane side[,]" that the cases involve the same Abbott product, and evidence regarding certain objective indicia of nonobviousness will be put forward in both); *id*. at 51-53, 86-87 (Abbott's counsel acknowledging certain factual overlap between the cases); *cf*. D.I. 16 at 10 (Abbott noting in the instant action that "the technology at issue among all five patents is sufficiently related to warrant consolidating the dispute in one action"))

To be sure, as discussed above, there are also real differences between the subject matter of the Ohio patents-in-suit and the Delaware patents-in-suit (those that are not subject to Abbott's Motion to Dismiss). Nevertheless, although the two actions are sufficiently different that the first-filed rule does not apply, they also involve undeniable factual and legal overlap, such that there would surely be efficiency gains from handling and trying the parties' entire dispute regarding Roxane's ANDA in a single forum. *Sig Simonazzi*, 295 F. Supp. 2d at 399 (finding that, while first-filed rule was inapplicable as second-filed action involved some additional patents, allowing second-filed action to proceed would "duplicate the parties' efforts and

expenses" and "reduc[e] efficiency overall").

Abbott asserts that the Court should take into account the fact that the Ohio Action was allegedly filed as part of an attempt to manipulate the venue system. (D.I. 28 at 45–50) As noted above, Roxane first asserted that it should be able to make and sell a generic version of ritonavir before the expiration of the '359 patent and the '752 patent. (D.I. 16 at 1–3) That triggered a 45-day window during which Abbott had the exclusive right to file an infringement suit against Roxane. *See* 21 U.S.C. § 355(j)(5)(B)(iii). But because the '359 and '752 patents are the last of the patents listed as covering ritonavir to expire, (*see* D.I. 16, ex. E), Abbott argues that it had no incentive to file any suit against them (so long as they were the only patents challenged by Roxane), (D.I. 16 at 2; 14–15). Indeed, even if Roxane were successful on its challenge to the '359 and '752 patents, Roxane still would be unable to market a generic version of ritonavir prior to 2016. (*Id.*)

Abbott claims that having lulled it into believing that it would have the exclusive right to sell any version of ritonavir until at least 2016, Roxane then amended its paragraph IV challenge to include the remaining Delaware patents-in-suit (the '497 patent, the '157 patent, and the '403 patent), all of which expire before the end of 2016. Then, just days later, Roxane filed suit in Ohio on the original two patents from its first ANDA, knowing that Abbott would almost certainly file a separate action relating to the three new patents added in the amended ANDA. Abbott contends that this allowed Roxane to have an improper venue foothold in the Southern District of Ohio (which it could use to its advantage), and to subvert the statutory scheme that underlies the ANDA process (which allows Abbott to have the first shot at selecting the forum for ANDA litigation as to the remaining patents). (D.I. 16 at 2–3)

Although the series of events that has brought the parties to their current procedural juncture is unusual, the Court finds that those events do not provide it with a license to ignore what it must otherwise consider under the *Jumara* transfer analysis—including efficiencies resulting from transferring this case to the forum in which a previously-filed, related ANDA litigation is proceeding. (D.I. 28 at 50 (Abbott's counsel noting that, despite its argument regarding the timing of Roxane's filings, "[w]e're not suggesting that you ignore any of the Jumara factors. That's the analysis that should be done.")) There is no allegation that Roxane has violated the Hatch-Waxman statute by proceeding as it has, (D.I. 28 at 74), and, although it may be unusual for a generic manufacturer to have filed a co-pending challenge in an ANDA dispute, the related litigation is but one factor to be weighed among the dozen *Jumara* considerations. Indeed, Roxane, in asserting that it has not acted in bad faith, alleges that after it filed its initial paragraph IV certification, the U.S. Patent & Trademark Office reached a new determination as to the validity of the other three Delaware patents, which convinced it that it should also mount a challenge to those patents. (D.I. 28 at 22–25) Finally, the Hatch-Waxman Act does not provide an absolute right for a brand-name manufacturer to proceed in the forum of its choosing. Indeed, this Court has transferred ANDA cases to other forums where such a transfer "may avoid redundant efforts and the possibility of inconsistent results." *Medicis Pharm. Corp. v. Nycomed U.S. Inc.*, C.A. No. 10-1099-SLR, 2011 WL 2457598, at *3 (D. Del. June 16, 2011). Absent evidence of a statutory violation or clear bad faith, the Court must consider the practical realities in the present case, which include a related, previously-filed

49

litigation on the same ANDA that is at issue in this District.[20]

For the foregoing reasons, this factor weighs in favor of transfer.

### iii. Administrative difficulties in getting the case to trial

The next factor is the "relative administrative difficulty in the two fora resulting from court congestion." *Jumara*, 55 F.3d at 879. Neither party has provided any direct evidence of the relative court congestion of the two prospective fora. The Court finds this factor to be neutral.

### iv. Local interests in deciding local controversies at home

In patent litigation, the local interest factor is typically neutral, "because patent issues do not [usually] give rise to a local controversy or implicate local interests." *TriStrata Tech., Inc. v. Emulgen Labs., Inc.*, 537 F. Supp. 2d 635, 643 (D. Del. 2008); *see also InvestPic, LLC v. SAS Institute, Inc.*, 871 F. Supp. 2d 317, 322 (D. Del. 2012). As Abbott notes, this patent litigation can have an impact on nationwide sales of pharmaceutical products by both companies, potentially affecting many Americans in different states. (D.I. 16 at 19-20)

However, "[w]hile the sale of an accused product offered nationwide does not give rise to a substantial interest in any single venue . . . if there are significant connections between a particular venue and the events that gave rise to a suit, this factor should be weighed in that venue's favor." *In re Hoffman–La Roche Inc.*, 587 F.3d 1333, 1338 (Fed. Cir. 2009) (citations omitted). Here, neither Abbott or Roxane are corporate citizens of Delaware, and neither

---

[20]     (*Cf.* D.I. 20, ex. A at 4-5 (District Court in Ohio Action noting that Abbott's "forum shopping" argument in this regard was "not the dispositive issue" as both "parties in this action are attempting to choose their preferred forum" and going on to consider other applicable legal issues in deciding Abbott's Motion to Dismiss or in the Alternative Transfer the Action to the District of Delaware)

Norvir® nor Roxane's ANDA product have been or will be made in this jurisdiction. Yet Roxane notes that "[a]t the center of this case is [also] Abbott's infringement allegation against a drug product developed in the Southern District of Ohio, by Ohio employees, at an Ohio company."[21] (D.I. 14 at 15) Although Roxane is a large company with a national presence, the Court can nevertheless see how there are people who work for Roxane in the Southern District of Ohio whose livelihood could be affected by the outcome of this litigation, particularly as to the question of whether production of the generic drug at issue may go forward. *Cf. Hoffman-LaRoche*, 587 F.3d at 1336 (finding that the "local interests" factor weighed in favor of transfer where the "accused drug was developed and tested within the [proposed transferee district]" and "the cause of action calls into question the work and reputation of several individuals residing in or near [the transferee] district and who presumably conduct business in that community"); *cf. Semcon Tech.*, 2013 WL 126421, at \*4 (noting that this factor could redound to movant's benefit if the case was made that "the outcome of [the suit] could have an impact on the local economy"). This is tempered by the fact that there is little in the record to go on to gauge how broad the case's impact will be in the Southern District of Ohio.

Ultimately, factoring in the nationwide impact of patent litigation like this, with the fact that there is some more concentrated impact on the Southern District of Ohio, the Court finds this factor weighs in favor of transfer, though only slightly.

### v. Public policy of the fora

Neither party makes an explicit argument that the next factor, regarding the public policy

---

[21]    To be sure, as Abbott notes, whatever decidedly local interest there may be in the dispute is not confined to Roxane's home district, as Abbott patents and an Abbott drug are very relevant to this litigation—interests presumably centralized in Illinois.

of the respective fora, should impact the transfer analysis relative to Abbott and Roxane. In light

of that, the Court finds this factor to be neutral. *Helicos Biosciences Corp. v. Illumina, Inc.*, 858

F. Supp. 2d 367, 375 (D. Del. 2012) (noting that, because neither party addressed this factor, it

would be accorded no weight in the Court's analysis).

### vi.    Familiarity of the trial judge with applicable state law in diversity cases

This is not a diversity case. "[P]atent claims are governed by federal law, and as such

both [courts are] capable of applying patent law to infringement claims." *In re TS Tech USA

Corp.*, 551 F.3d 1315, 1320 (Fed. Cir. 2008) (internal quotation marks omitted); *see also

Link_A_Media*, 662 F.3d at 1224 (same). This factor is therefore neutral.

### c.    Conclusion Regarding the *Jumara* Factors

The following six factors all weigh in favor of transfer to the Southern District of Ohio:

Defendant's forum preference, whether the claim arose elsewhere, convenience of the parties, the

location of books and records (to a limited degree), practical considerations, and local interests

(again, to a limited degree). Plaintiff's choice of forum is the only factor that weighs against

transfer. The remaining *Jumara* factors are neutral.

Ultimately, this is a case where Delaware has no ties to Abbott or Roxane, while the

proposed transferee forum not only has ties to both parties and to the underlying dispute, but is

also the forum in which litigation regarding the same ANDA is already ongoing. *IpVenture, Inc.*,

879 F. Supp. 2d at 434 (granting motion to transfer where "there is little beyond Plaintiff's

choice of forum . . . to suggest that transfer should be denied"). Although Abbott's choice of

forum is entitled to considerable deference, here the Court finds that the balance of the *Jumara*

factors weigh strongly in favor of transfer.

### C.     Abbott's Motion to Dismiss

As noted above, Abbott's Motion to Dismiss seeks dismissal of all claims and counterclaims related to the '359 patent and the '752 patent, pursuant to either Rule 41(a) or 15(a), in that claims regarding those patents are proceeding in the Ohio Action. (D.I. 24, 29) Roxane did not agree to dismissal of these claims and counterclaims, largely because it saw the motion as a wrongful "attempt to influence the outcome of Roxane's Motion to Transfer." (D.I. 27 at 6) At oral argument, Roxane's counsel stated that other than as to its belief that Abbott's Motion to Transfer should not impact the transfer calculus, it did not otherwise oppose the motion, and noted Roxane's view that a grant of the motion to transfer "may well moot out the dismissal." (D.I. 28 at 90)

In light of the Court's recommendation that the instant action be transferred, the Court recommends that Abbott's Motion to Dismiss be denied as moot. If the case is transferred to the Southern District of Ohio, claims and counterclaims regarding the '359 patent and the '752 patent will be taken up in one forum.

### III.    CONCLUSION

For the foregoing reasons, the Court recommends that the Motion to Substitute be GRANTED, that Roxane's Motion to Dismiss be DENIED, that Roxane's Motion to Transfer be GRANTED and that Abbott's Motion to Dismiss be DENIED as moot.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order In Non-Pro Se Matters For Objections Filed Under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: May 28, 2013

Christopher J. Burke
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE